UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

_____
                                   )
PREFERRED MUTUAL INSURANCE CO.,    )
as subrogee of Ingo and Daria Dutzmann,  )
                                   )
        Plaintiff,                 )   Civil Action No.
                                   )   15-13414-FDS
        v.                         )
                                   )
BARROS COMPANY, INC., and          )
GENERAC HOLDINGS INC.,             )
                                   )
        Defendants.                )
_____)

# MEMORANDUM AND ORDER ON
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for negligence and breach of warranty arising from a gas explosion at a residence. Plaintiff Preferred Mutual Insurance Co. is the subrogee of Ingo and Daria Dutzmann. On the evening of March 11, 2015, the Dutzmanns' gas generator leaked propane into their basement. The gas ignited, causing an explosion and destroying their home.

The amended complaint alleges that defendants Generac Holdings, Inc., the manufacturer of the generator, and Barros Company, Inc., the company that installed that generator, negligently caused the explosion. It also alleges that defendants breached the implied warranty of merchantability and breached their contract with the Dutzmanns.

Defendants have moved for summary judgment. The negligence claims can be distilled down to two sets of questions. First, what was the cause of the explosion? Plaintiff contends that it was falling ice that ruptured the gas line, while defendants contend that the cause remains unknown. Second, if falling ice indeed caused the explosion, should Generac's installation

manual have explicitly warned of that risk? And, even if Barros's installation complied with all governing regulations, should it have taken additional measures to protect the generator system from falling ice?

The parties have provided competing expert reports on these issues. Defendants have requested to strike plaintiff's expert reports, contending that they are unreliable and should be excluded under Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).[1] Because plaintiff has set forth sufficient evidence on which its experts relied, the request will be denied. As to the competing expert reports, there are disputed issues of material fact requiring that the negligence claims proceed to trial. Because a defendant cannot be found to have been negligent without also having breached the implied warranty of merchantability, the motion will also be denied as to the warranty claim.

However, the amended complaint does not identify any contract between the parties that could have been breached. Therefore, summary judgment will be granted as to the breach of contract claim.

Accordingly, and for the following reasons, the motion for summary judgment will be granted in part and denied in part.

I.  **Background**

   A.  **Factual Background**

The following facts are as set forth in the record and are undisputed except as noted.

   1.  **Installation of the Generator**

Ingo and Daria Dutzmann purchased a home at 24 Laneway Street (the "property") in

---

[1] Defendants did not separately move to strike plaintiff's expert reports. However, because defendants conceded that their request was substantively a *Daubert* motion, it will be treated as such.

Taunton, Massachusetts, in 1993. (Ingo Dutzmann Dep. Vol. I at 15). The property was insured by Preferred Mutual Insurance Co.

In 2004 or 2005, the Dutzmanns installed a propane range in their kitchen. (*Id.* at 32). A company called Propane Plus installed a small propane tank that fed the range on the south side of the house. (*Id.*).

In 2010, the Dutzmanns hired Barros to install a generator manufactured by Generac on the north side of the house. (Barros Dep. at 26-27). Kevin Lehane, a now-former employee of Barros, installed the gas piping for the generator. (Lehane Dep. at 8). Propane Plus installed two larger tanks, 100 gallons each, on the north side of the house to fuel the generator. (Ingo Dutzmann Dep. Vol. I at 32; Barros Dep. at 28, 42). Barros had, however, recommended what size tanks to use and marked where on the ground they should go. (Barros Dep. at 42-43).

The generator was installed more than ten feet away from the tanks and more than five feet from the bulkhead, as required by applicable building codes. (Lehane Dep. at 11-12, 27). It was placed on a four-by-four-foot bed of crushed stone. (Barros Dep. at 43).

About ten to fifteen feet of black iron piping ran from the propane tanks. (*Id.* at 107-08). The plumbing code required supports for the piping at least every eight feet. (*Id.* at 107). Despite the short distance of the pipe, four roughly equidistant supports were installed. (*Id.* at 107-08). In addition, a one-foot flexible hose was used to connect the iron piping to the generator in order to minimize vibrations that could cause a breach in the piping. (*Id.* at 88).

The piping was not installed underground because the piping only went a short distance and it was close to the house. (*Id.* at 112). In addition, underground installation is more expensive. (*Id.*).[2] It is undisputed that Barros and Propane Plus did not consider whether falling

---

[2] The piping was installed by Baraby Electric. (Johnson Dep. at 25-26). Propane Plus had also provided a quote for installing the piping, and suggested that the piping be underground. (*Id.*). However, because underground

snow or ice could damage the piping. (*Id.* at 101).[3]

The piping installation was approved by the Taunton plumbing and gas inspector. (Lehane Dep. at 47; Bibby Dep. at 13). The Taunton Fire Department separately approved the installation of the tanks. (Johnson Dep. at 87).

### 2. **The Explosion**

In 2013, the Dutzmanns had hired a contractor to perform mold remediation in their upstairs bedroom. (Ingo Dutzmann Dep. Vol. I at 45). The mold remediation project was finished by March 11, 2015, but the Dutzmanns had not yet moved back into the bedroom. (*Id.* at 46).

Over the past few winters, Ingo Dutzmann had observed ice dams on the roof of the property. (*Id.* at 38). He testified that he would periodically use a pole to knock down icicles. (*Id.* at 38-39, 49, 54). During the winter of 2014-15, he accidentally cracked a window while trying to knock down icicles, and decided to discontinue the practice. (*Id.* at 53-54).[4] He had never observed falling snow or ice in the area of the generator or propane tanks. (Ingo Dutzmann Dep. Vol. II at 31). Nor had he encountered any problems with the generator, other than having to restart it on two prior occasions during snowstorms. (*Id.*).

According to the National Oceanic and Atmospheric Administration, on the date of the explosion, March 11, 2015, the Taunton area was covered by between 20 and 39 inches of snowpack. (Ellison Report at 21). In addition, the area had experienced significant temperature

---

piping was more expensive, the Dutzmanns opted to have the piping installed above ground. Burying the piping was not required by any applicable code. (*Id.* at 21).

[3] During the 2014-15 winter, Propane Plus received reports that falling snow and ice had destroyed natural-gas meters. (Johnson Dep. at 100).

[4] However, there is conflicting testimony on whether Ingo Dutzmann knocked icicles down from the roof on the day preceding the accident.

4

fluctuations over the previous week, making "significant melting and refreezing of snow and ice" possible. (*Id.*).

The Dutzmanns' son, Alexander, was also living at the property with his wife, Amy. (Alexander Dutzmann Dep. at 12). At 1:15 a.m. on March 11, 2015, Alexander returned home after a late music rehearsal. (*Id.* at 50). He soon noticed an "overwhelming smell of gas." (*Id.* at 52). He woke Ingo, who was sleeping on the couch in the living room, and asked whether he could smell anything. (*Id.*). Ingo replied that he could not smell anything. (*Id.* at 53).

At that point, Alexander went into the kitchen to check that the range was off. (*Id.*). After confirming that the range was off, he noticed that the smell of gas was not as strong as it had been in the living room. (*Id.*). Ingo suggested that the smell was caused by a dead animal in the crawl space. (*Id.* at 53-54).

Alexander then went upstairs to the second floor, where the smell of gas was much weaker. (*Id.* at 54). About twenty minutes later, he got in the shower, and seconds later he heard a huge explosion. (*Id.* at 55). The power and water immediately went out, and the entire family quickly evacuated. (*Id.*). Although the Taunton Fire Department arrived, the house was almost totally destroyed. Fortunately, none of the Dutzmanns were injured.

### 3. **The Investigations**

Two days later, on March 13, 2015, Ingo met with the Taunton Deputy Fire Chief, Michael Sylvia. (Ingo Dutzmann Dep. Vol. II at 107). Sylvia attended the Massachusetts Firefighting Academy and is one course shy of an associate's degree in fire science from Bristol Community College. (Sylvia Dep. at 8).

Sylvia investigated the fire's cause and origin for somewhere between 30 and 90 minutes. (*Id.* at 60). Sylvia theorized that when Alexander turned on the hot water for his shower, the

5

water heater ignited propane gas in the basement. (Ingo Dutzmann Dep. Vol. II at 106-07). Sylvia noted that the piping for the generator had been severed. (Sylvia Dep. at 25-26). He concluded that "[a] portion of ice accumulation on the roof fell and ruptured the propane gas line, running along the house from the tank to the emergency generator." (*Id.* at 28). He based this conclusion on his observation that "[i]t was the only area where there was any gas that could have caused the explosion." (*Id.*). However, he could not recall whether Ingo had told him that there was ice falling from the roof the day before the explosion. (*Id.* at 79).

Sylvia shared his theory with Ingo at approximately 7:30 a.m., after which he performed no additional investigation. (*Id.* at 55). The Fire Department report ultimately concluded that:

> A portion of ice accumulation on the roof fell and ruptured the propane gas line running along the house from the tanks to the emergency generator. The leaking gas entered the foundation and accumulated in the basement, when the oil fire heating system that also provided hot water came on it ignited the mixture and caused the explosion. The State Fire Marshals Office also responded, Trooper Michael Fagen, as well as Michael Hennessy hired by the insurance carrier.

(Pl. Ex. 5 at 11).

Preferred Mutual's first cause-and-origin investigator, Michael Hennessy, also spoke with Ingo at approximately 9:00 a.m. that day. (Hennsesy Dep. Vol. I at 29, 110). Hennessy had been a lieutenant with the Woburn Fire Department between 1976 and 1993, and has worked for NEFCO Fire Investigations for more than two decades as a fire analyst. (Hennessy Report at 4). His handwritten notes indicated that Sylvia had informed him that someone, likely Alexander Dutzmann, had heard ice falling recently. (Hennsesy Dep. Vol. I at 26). Hennessy recalled Ingo stating that he had knocked down icicles the day before the explosion. (*Id.* at 34). His notes specifically stated, "that day knocked down icicles. No spill. Did not hit pipe. Tuesday 9:00 a.m. starting to get warmer." (*Id.*). Ingo then told Hennessy that he believed falling ice had damaged the flexible hose connecting the piping to the generator. (*Id.* at 40). Hennessy was

6

under the impression that Dutzmann had been given this opinion by someone from the Taunton Fire Department. (*Id.*).

Hennessy observed that a portion of the iron piping was broken at a threaded union. (*Id.* at 63). In addition, portions of the flexible hose had been destroyed by the fire, and there were gaps around the oil fill pipes. (*Id.* at 73, 99).

Hennessy had no further discussions with Ingo after that meeting. (*Id.* at 110). That morning, Hennessy also spoke with Sylvia over the phone to get his opinion as to what happened. (*Id.* at 110-11). That was the only conversation he had with Sylvia. (*Id.*). Later, after learning that Ingo denied clearing ice off the roof before the explosion, Hennessy was no longer sure whether that had occurred. (Hennessy Dep. Vol. II at 22). It is undisputed that Hennessy did not observe any direct evidence that falling snow or ice ruptured the piping. (*Id.* at 51).

Based on his interviews and observations, Hennessy concluded that the explosion was caused by "a portion of the ice dam build up at the north end of the residence falling and impacting the propane piping. The resultant fugitive propane gas encountered a competent ignition source in the basement of the structure and ignited violently. The family members at the sound end of the structure miraculously survived this violent explosion unhurt." (Hennessy Report at 2).

Preferred Mutual then retained a second cause-and-origin investigator, Andrew Ellison. Ellison has a degree in mechanical engineering and a master's degree in fire-protection engineering. (Ellison Report at 1). He conducted an initial site visit on March 25, 2015, which was limited to a visual examination. (*Id.* at 4). Ellison also interviewed both Ingo and Amy Dutzmann. (*Id.*). In his report, Ellison wrote that Ingo stated that the bulkhead "leaked [water]

7

like a sieve" and that there was a "commercial-grade glass door at the bottom of the bulkhead stairs that had a gap under it sufficient for water to flow into the basement." (*Id.* at 7).

Ellison conducted a follow-up visit to the property on April 8, 2015. (*Id.* at 8). During the follow-up visit, he obtained five pieces of evidence, including two sections of gas piping, the regulator, a fuel tank fill line, and part of the kitchen stove pipe. (*Id.* at 17). The evidence was examined at a laboratory on April 6, 2017. (*Id.*).

Based on his observations, information gathered from interviews, and laboratory results, Ellison was unable to identify the condition of the foundation of the piping system prior to the explosion. (Ellison Dep. Vol. I. at 88). Although he identified a leak in the service valve in the copper piping for the kitchen stove, he believed the leak was not large enough to have contributed to the explosion. (*Id.* at 68).

Nevertheless, based on the evidence, Ellison agreed with Sylvia and Hennessy, and concluded that snow and ice had fallen off the roof and ruptured the unprotected propane gas pipe and/or the flexible hose. (Ellison Report at 2). He opined that gas migrated into the Dutzmanns' basement, and ignited after Alexander Dutzmann turned on the hot water. (*Id.*). However, Ellison was unable to conclusively rule out a leak from the Dutzmanns' gas stove, because the stove's aluminum piping had been destroyed. (*Id.* at 13).

Defendants have retained their own cause-and-origin expert, Wayne Miller. Miller agreed that the cause of the explosion was leaked propane gas that had ignited. (Miller Dep. at 33). However, he was unable to determine whether the leak had come from pipes connected to the generator or the kitchen range. (Miller Report at 5). In addition, he was unable to determine the cause of the leak. (*Id.*).

8

## B. Procedural Background

Plaintiff filed this action on September 22, 2015. The amended complaint contains four counts: (1) a claim for negligence against Barros for failing to adequately install the generator in such a way as to protect it from snow load; (2) a claim for negligence against Generac for failing to warn installers about the dangers of snow damage; (3) a claim for breach of the implied warranty of merchantability against both defendants; and (4) a claim for breach of contract against both defendants for failing to install the generator in a workmanlike manner. (Docket No. 36).

Barros, in its answer, filed two cross-claims against Generac, one for contribution and one for common-law indemnity. (Docket No. 27). Generac in turn filed five cross-claims against Barros, claiming: (1) contribution; (2) common-law indemnity; (3) contractual indemnity; (4) breach of contract; and (5) failure to procure insurance. (Docket No. 33).

After the close of discovery, defendants jointly moved for summary judgment as to all four of plaintiff's claims.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896

F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

### III. Analysis

#### A. *Daubert* Motion

Before addressing defendants' arguments concerning applicable standards of care, the Court must resolve defendants' request to strike plaintiffs' expert reports. Defendants concede that this is substantively a *Daubert* motion.

##### 1. Standard of Review

Fed. R. Evid. 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert*. *See United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). That gatekeeping function requires that the court consider three sets of issues: (1) whether the proposed expert is qualified by "knowledge, skill, experience, training or education"; (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge"; and (3) "whether the testimony [will be] helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

Rule 702 further requires the court to examine whether those methods have been reliably applied. In other words, the court must "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591).

In evaluating whether expert testimony will be helpful to the trier of fact, the court must

11

determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (citations omitted); *see also Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) ("The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.").

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

### 2. <u>Analysis</u>

Here, defendants do not meaningfully challenge the qualifications of plaintiff's experts. Rather, defendants contend there was no reliable factual support for plaintiff's theory that falling ice pierced the propane gas pipe. Thus, defendants reason that plaintiff's expert reports are "unreliable" and "should not be considered for the purposes of this summary judgment motion." (Mem. in Supp. at 7). They contend that the Sylvia, Hennessy, and Ellison reports are grounded in a theory of *res ipsa loquitur*, which is not permitted in gas-explosion cases. *See Musolino Le Conte Co. v. Boston Consol. Gas Co.*, 330 Mass. 161, 163 (1953). Defendants state that the "genesis" of plaintiff's theory was Sylvia's speculation that ice had fallen from the roof and

pierced the gas line. (Mem. in Supp. at 9).

It is true that there is no direct evidence supporting plaintiff's assertion that the explosion was caused by falling ice. However, "[b]y the very nature of a fire, its cause must often be prove[d] through a combination of common sense, circumstantial evidence[,] and expert testimony." *Ricci v. Alt. Energy Inc.*, 211 F.3d 157, 162 (1st Cir. 2000).

The record clearly contains sufficient factual support for plaintiff's theory concerning the cause of the explosion. The winter of 2014-15 set new snowfall records for the greater Boston area, and on the date of the explosion there were approximately two to three feet of snow on the ground in Taunton. (*See* Ellison Report at 21; Copeland Report at 2-3). Ingo Dutzmann testified that during that winter, he periodically heard snow and ice sliding off the roof. (Ingo Dutzmann Dep. Vol. II at 58). Alexander Dutzmann similarly testified that he previously heard sounds that he thought was ice falling off the roof, although he could not remember seeing any falling ice. (Alexander Dutzmann Dep. at 49-50). Plaintiff's engineering expert, John Gilewicz, estimated that on the date of the explosion, there was a 3,029-pound snow load on the roof above the generator and gas piping. (Gilewicz Report at 5). Based on weather conditions, plaintiff's meteorological expert, Robert Copeland, estimated that a 10 to 100-pound block of snow and ice fell off the Dutzmanns' roof in the early morning hours of March 11, 2015. (Copeland Report at 7-8). And plaintiff's primary experts, Hennessy and Ellison, conducted extensive interviews, tested physical evidence, and made site visits.

To be sure, plaintiff's proposed fact pattern is based on inferences, not eyewitness testimony. However, defendants' argument that it is impossible to determine with precision the exact cause of the explosion "does not defeat the admissibility" of plaintiff's expert testimony. *Pacific Indem. Co. v. Dalla Pola*, 65 F. Supp. 3d 296, 303 (D. Mass. 2014).

Defendants further contend that Sylvia's investigation "was breathtakingly incomplete" because of its short duration and his failure to examine the gas piping. (Mem. in Supp. at 9). In addition, defendants note various inconsistencies in the Dutzmanns' testimony, on which Sylvia relied to make his conclusions. (*Id.* at 10).[5] However, "[o]bjections of this type, which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility. [Accordingly,] these matters are for the jury, not for the court." *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007). Defendants are of course free to cross-examine plaintiffs' experts on those factual issues.

Finally, defendants raise a series of arguments that Hennessy and Ellison failed to consider all available evidence. These arguments are not sufficient, however, to require exclusion of the testimony.

First, defendants contend that plaintiff's experts failed to consider evidence concerning the foundation and bulkhead. (Mem. in Supp. at 11). As noted earlier, both Hennessy and Ellison concluded that propane gas migrated into the basement of the Dutzmanns' home, where it was ignited by the water heater. The experts posited that the gas entered the basement through gaps surrounding the oil fill pipes or the basement bulkhead that leaked like a "sieve." In particular, defendants note that there was inconsistent testimony concerning the bulkhead; for example, Alexander Dutzmann testified that the bulkhead was "a little rusted," but "worked fine." (Alexander Dutzmann Dep. at 94-95). However, as plaintiff notes, Hennessy and Ellison were not required to pinpoint the exact route through which the gas entered the basement.

Second, defendants contend that Hennessy and Ellison failed to consider evidence that

---

[5] For example, Sylvia testified that Ingo Dutzmann had told him that he heard falling ice earlier in the day. However, Ingo later denied telling anyone that he heard ice come off the roof.

14

Ingo Dutzmann himself caused the explosion by knocking icicles from the roof. (Mem. in Supp. at 12). Hennessy's handwritten notes stated on the day preceding the explosion, Ingo had "knocked down icicles" but that there was "[n]o spill" and that he "did not hit [the] pipe." (Hennsesy Dep. Vol. I at 34). However, at his deposition, Ingo denied knocking off icicles, stating that he had stopped the practice after accidentally damaging a window that winter. (Ingo Dutzmann Dep. Vol. I at 53-54). Later, in his deposition, Hennessy stated that he must have made a mistake and could no longer recall whether Ingo cleared ice off the roof before the explosion. (Hennessy Dep. Vol. II at 21-22). Ellison then relied on Ingo's testimony in preparing his report. (Ellison Dep. at 69). While those inconsistencies certainly provide a basis for cross-examination, they do not warrant the relatively extreme remedy of excluding plaintiff's expert reports altogether. *See Pacific Indem. Co.*, 65 F. Supp. 3d at 304.

Third, defendants contend that Hennessy and Ellison failed to consider evidence of significant snowpack. (Mem. in Supp. at 13-14). As discussed earlier, on the date of the explosion, Taunton was covered by between 20 and 39 inches of snowpack. (Ellison Report at 21). However, the gas piping was no higher than 14 inches above the ground. (Ellison Dep. at 57). Therefore, defendants contend that the gas pipe must have been covered by snow. But that argument ignores Ellison's testimony that even if the pipe was covered, a fact which plaintiff does not concede, a "piece of snow and ice falling off the roof . . . would still transfer the force of its weight and movement down to the pipe below." (*Id.* at 58). Plaintiff has provided an additional expert report in support of that proposition. (Kreuzer Report at 19).

Fourth, defendants contend that Hennessy and Ellison failed to explore fully the possibility that the explosion was caused by a leak in the kitchen propane system. (Mem. in Supp. at 15). They note that neither expert was able to rule out a kitchen leak with certainty.

15

Again, however, plaintiff has offered sufficient evidence in support of its theory that the generator's gas piping was the source of the leak.

Fifth, defendants contend that Hennessy and Ellison failed to consider the possibility that the leak was caused by damage to the regulators and/or valves mounted on the propane tanks. (*Id.* at 16). The regulators and valves were installed by Propane Plus, which is not a party in this litigation. Putting aside the fact that Ellison had ruled out the regulator as the source of the leak, this is substantively another attack on plaintiff's expert analysis. (Ellison Report at 20). That type of argument is better reserved for cross-examination at trial.

In summary, the arguments made by defendants as to various flaws or weaknesses in plaintiff's expert evidence go to the weight of that evidence, not its admissibility. Defendants' motion to exclude the testimony and reports of plaintiff's experts will therefore be denied.

### B. <u>Counts One and Two—Negligence</u>

Defendants next contend that they were not negligent because the gas piping installation complied with all applicable regulations. The parties agree that the installation was governed by 248 C.M.R. §§ 4.00 and 5.00, which equate to National Fire Protection Association ("NFPA") standards 54 and 58.[6] Specifically, NFPA 54 "covers the piping from the outlet of the first stage regulator to the gas utilization device," and thus covers the gas piping and generator installed by Barros. (Ellison Report at 22-23). Section 6.2.1 of NFPA 54 required that "[p]iping installed

---

[6] "248 CMR 4.00 through 8.00, collectively the Massachusetts Fuel Gas Code, governs the installation of fuel gas piping systems, fuel gas utilization equipment, and related accessories throughout the Commonwealth." 248 C.M.R. § 4.01. According to current regulations, "NFPA 54" is the "2012 Edition of the *National Fuel Gas Code* published by the National Fire Protection Association," and "NFPA 58" is the "2011 Edition of the *National Liquefied Petroleum Gas Code* published by the National Fire Protection Association, including Errata Number 58-11-1 issued October 29, 2010 and Errata Number 58-11-2 issued November 30, 2011." 248 C.M.R. § 4.02. But as of 2010, when the system at issue here was installed, the 2002 edition of NFPA 54 and the 2001 edition of NFPA 58 were in force. (Mem. in Supp. at 5; Mem. in Opp. at 3). "For most installations of gas piping systems in Massachusetts, the Board adopts NFPA 54 as modified by 248 CMR 5.00 *Amendments to NFPA 54*." 248 C.M.R. § 4.03(1). "For installations of undiluted liquefied petroleum gas not explicitly covered by NPFA 54 as modified, the Board adopts NFPA 58 as modified by 248 CMR 8.00: *Amendments to NFPA 58*." 248 C.M.R. § 4.03(2).

aboveground shall be securely supported and located where it will be protected from physical damage"; in the then-operative edition, it did not include any specific reference to snow or ice. (*Id.* at 23).[7]

NFPA 58 covers the "piping and fittings between and including the propane tanks and the first stage [ ] regulator." (*Id.* at 24). Section 3.2.23 of NFPA 58 required that "[i]n areas where heavy snowfall is anticipated, piping, regulators, meters, and other equipment installed in the piping system shall be protected from the forces anticipated as a result of accumulated snow." (*Id.* at 24). The NFPA has most recently quantified "heavy snowfall" as areas with a ground snow load of 100 pounds per square foot. (Ellison Dep. at 137-38). By contrast, the building code specified that the ground snow load in Taunton was 30 pounds per square foot. (*Id.* at 136). Therefore, Taunton was not a "heavy snowfall" area as defined by the NFPA.

Taking these factors together, along with testimony that the generator and piping were installed in full compliance with applicable codes, defendants contend that they are entitled to summary judgment. (Mem. in Supp. at 6; Bibby Dep. at 13; Johnson Dep. at 87).

However, while compliance with a statute or regulation is *prima facie* evidence of due care, it is not conclusive. *Rochleau v. Town of Millbury*, 115 F. Supp. 2d 173, 179 (D. Mass. 2000) (citing *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 139-40 (1985); *Rice v. James Hanrahan & Sons*, 20 Mass. App. Ct. 701, 708 (1985)). Here, one of plaintiff's experts has opined that defendant Barros could have installed the gas piping "on the gable end of the property," buried the piping, or provided additional support. (Ellison Report at 36). He has also stated Generac should have included warnings about the risk of falling snow and ice in its

---

[7] In the 2010 revision cycle, published in 2011, the Technical Committee on Fuel Gas commented that that section "covers physical damage protection, which includes physical damage from snow." (Ellison Report at 23 (citing NFPA 54 Report on Comments A2011 54-15 Log #17, pg. 54-4)).

17

installation manual. (*Id.* at 37). Under the circumstances, that is sufficient evidence for the negligence claims to survive.

### C. Count Three—Implied Warranty of Merchantability

Count Three asserts a claim for breach of the implied warranty of merchantability under Mass. Gen. Laws ch. 106, § 2-314. To establish such a claim, a plaintiff bears the burden of proving "a defect in the product or an unreasonably dangerous condition which existed at the time the product left the [manufacturer's] control." *Enrich v. Windmere Corp.*, 416 Mass. 83, 89, (1993) (citing *Colter v. Barber-Greene Co.*, 403 Mass. 50, 62 (1988)). A manufacturer may be liable under a breach of warranty claim, "even though he or she properly designed, manufactured, and sold his or her product." *Colter*, 403 Mass. at 62.

Defendants correctly note that the parties do not dispute that the generator functioned properly until the date of the explosion. And, plaintiff does not contend that the black iron pipe itself connecting the propane tanks to the generator was defective.

However, under Massachusetts law,

> [a] defendant in a products liability case in this Commonwealth may be found to have breached its warranty of merchantability without having been negligent, but the reverse is not true. A defendant cannot be found to have been negligent, without having breached the warranty of merchantability.

*Hayes v. Ariens Co.*, 391 Mass. 407, 410 (1984) (overruled on other grounds by *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998)). Because the Court has concluded that summary judgment cannot enter on plaintiff's negligence claims, it must necessarily be denied as to the warranty claim as well. Accordingly, the motion for summary judgment with respect to Count Three will be denied.

### D. Count Four—Breach of Contract

Count Four asserts a claim for breach of contract. "To state a claim for breach of contract

under Massachusetts law, a plaintiff must allege, at minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Gluckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997). The formation of a contract requires the manifestation of mutual assent by the parties to the agreement, which in the most traditional method involves an offer by one of the parties and an acceptance of that offer by the other. *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31-32 (1st Cir. 1988); Restatement (Second) of Contracts § 17 (1981).

Plaintiff has failed to identify a contract that could have been breached. Rather, plaintiff merely contends that "defendants breached [a] contract by failing to install the generator in a good and workmanlike manner and by failing to comply with the standards associated with the installation of gas generators." (Mem. in Opp. at 18). However, that is substantively a negligence claim, which has already been asserted in Counts One and Two. It is undisputed that after the initial installations, the Dutzmanns retained neither Barros nor Generac to service the generator and gas piping. While the generator had a three-year warranty, it expired in January 2014, more than one year before the explosion. (Def. Ex. S).

Accordingly, summary judgment will be granted as to the breach of contract claim.

### E. The Limitation of Liability Provision Is Unenforceable

Finally, defendants contend that Generac's "Conditions of Sale and Limited Warranty" limits plaintiff's recovery. (Mem. in Supp. at 20). The text of that provision states, "Generac's only liability shall be the repair or replacement of part(s) as stated above. In no event shall Generac be liable for any incidental or consequential damages, even if such damages are a direct result of Generac's negligence." (Def. Ex. S).

Massachusetts has abrogated the enforceability of such provisions in the consumer

19

context. Mass. Gen. Laws ch. 106, § 2-136A(2) provides as follows:

> Any language, oral or written, used by a seller or manufacturer of consumer goods and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable.

Therefore, the limitation-of-liability language in Generac's warranty is not applicable.

Defendants rely on *Eastern Fisheries, Inc. v. Airgas USA, LLC,* for the proposition that "[t]he exclusion of consequential damages is not unenforceable for unconscionability." 2016 WL 6139949, at *9 (D. Mass. Jan. 28, 2016). However, putting aside the fact that *Eastern Fisheries* involved the application of Delaware law, it is inapposite because it involved a dispute between two commercial entities. As that court noted, "[i]n commercial settings, the parties are presumed to act at arms' length." *Id.* By contrast, here plaintiff is the subrogee of the Dutzmanns, who were private consumers.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to Count Four and is otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: August 20, 2018                         United States District Judge